UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

BREAKING MEDIA, INC.                                    Case No.: 1-21-mc-00194-KPF

                        Petitioner,

            - against -                                 **DECLARATION OF DAVID S.
                                                        KORZENIK IN SUPPORT OF
EVAN P. JOWERS,                                         BREAKING MEDIA, INC.'S
                                                        APPLICATION FOR
                        Respondent.                     ATTORNEYS' FEES**

-------------------------------------------------------X


**David S. Korzenik**, an attorney admitted to practice law in the State of New York,

pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a partner at the firm Miller Korzenik Sommers Rayman LLP, counsel for

***Petitioner Breaking Media, Inc.***, publisher of *Above the Law* ("ATL").  I make this Declaration

in support of ATL's application for reasonable attorneys' fees incurred making its Motions to

Quash the Subpoena served on ATL in February 2021 by Respondent Jowers and his counsel,

Robert Tauler ("Motions to Quash").

2.      The Court by its Opinion and Order of April 7, 2021 "f[ound] that the Subpoena

should never have issued and determine[d] that Petitioner is entitled to recover reasonable

attorneys' fees and expenses incurred in responding to the Subpoena."  *See Breaking Media, Inc.

v. Jowers*, No. 21-mc-194 (KPF), Dkt. No. 27, 2021 WL 1299108, at *8 (S.D.N.Y. Apr. 7, 2021)

("Order").

3.      The work required of us on ATL's behalf was compounded by Respondent's

counsel's approach: He declined at the last minute to extend our time to a) complete the requisite

Meet & Confer or b) make a motion to quash, if that was needed.  Hence, we were put to a "fire

drill" – having to prepare a motion on an expedited basis while investigating the facts; and then having to prepare and file a subsequent and updated Amended Motion to Quash.  Respondent's counsel may say that he was up against a discovery deadline.  But granting us the extension would have made no difference as to any deadline he might have had: Either way, whether he extended our time or if he refused to extend our time and compelled us to file a Motion to Quash, he still would not have received documents from ATL.  Putting us through this needless fire drill compounded our costs and lost time.

4.      ***Refusals to Extend Time for Meet and Confers Are Rare***: I have responded to many Subpoenas to the press.  It is exceedingly rare for any issuing party to decline a request for additional time.  Most litigants understand that Courts expect and require a Meet & Confer prior to any motion practice.  The parties need to assess what is being sought; why it is needed; what is at stake from a recipient's point of view; and whether there is a way to avoid the motion. Respondent's counsel declined our request for such an extension even though we had not completed our meet and confer or the necessary inquiries.

5.      ***Fees on ATL's Motions to Quash***: Attached to this Declaration as **Exhibit A** are true and correct copies of my firm's Statement describing time expended from February 11, 2021, when I first became involved with this matter, through April 15, 2021, when our efforts to negotiate a resolution of the fee application came to an unsuccessful end.  The Statement has been minimally redacted to exclude private and attorney-client information.  The total time expended on responding to the Subpoena and preparing the motions was *79.40* hours: Of that time *39.50* hours by me ($550/hour); *20.10* hours by my partner, Terence Keegan ($425/hour); and *19.80* hours by our associate, Zachary Press ($400/hour).  The total award requested, with $106.17 in expenses, comes to **$38,293.67**.

6.     Time expended on emergency efforts often requires more time and effort than otherwise.  The scattershot and expansive nature of the Subpoena's discovery demands (both the document demands and the list of 30(b)6 topics) made work on the Motions all the more time consuming.  And time was needed too to debunk the peculiar rationales offered for the Subpoena.

7.     ***Meet and Confer with Adverse Counsel to Resolve the Fee Application***: When the Court sent counsel a copy of its April 7 ruling on the Motion to Quash, the Court suggested that counsel confer and make an effort to resolve the fee award before submitting any motion for an assessment of fees.  Between April 8 and April 15, I spoke and exchanged emails with Respondent's counsel Robert Tauler to see if we could resolve the amount of fees.  He asked me to send a statement of time spent on the matter.  I sent the statement that I had to Mr. Tauler.

8.     ***Our Offer To Settle the Attorneys' Fees Amount***:  Though several time entries had yet to be input, I based my offer to Mr. Tauler on what we then had and could send him.  I proposed that my time would be billed at a reduced billing rate of $425/hour - about a 23% reduction of my current rate of $550/hour.  (My partner Terence Keegan's rate was also discounted to $425/hour, and our associate Zach Press' rate was $400/hour.)  The total at my 23% reduced rate came to $30,046.17 with expenses.  I then offered a further reduction of 10% to close the matter – that came to $27,000.00, rounded down.

9.     ***Respondent's Confused Refusal of Our Offer***: Mr. Tauler and I had telephone calls to discuss resolution of the fee issue.  We also exchanged emails.  Attached is **Exhibit B** which is my offer and Mr. Tauler's response.  He insisted on his client's committing to $200,000.00 in advertising with ATL.  We had never asked for any such commitment nor anything like it.  We simply sought a compromise of the fee amount.  What did seem evident was

that Mr. Tauler was still trying to push us into his Texas conspiracy theory that fueled his Subpoena to ATL.  Among other strange statements, Mr. Tauler included in his email: "Do you represent Breaking Media even? Or are you just doing this as a favor for Robert Kinney?"  *See* Ex. B, at 2.  The reality is that I do not know Mr. Kinney; I had never heard of him prior to this subpoena; I have never spoken with him; and I do not plan to.  Clearly, Mr. Tauler was trying to embroil us in his Texas acrimony, something which we had no intention of allowing.

10.     ***Closing Threat***: Mr. Tauler ended with a threat relating again to something that I had not discussed with him during any of our fee discussions.  Something which may, but should not, have governed his approach here.  He concluded his April 13 email: "By the way, I have not negotiated here in any way my own claims under California law for false light defamation.  Breaking media will be 'broke media' after I am done with them, of that you can be sure."  Ex. B, at 2.  I will leave that comment to speak for itself.

11.     My current billing rate is $550/hour – though I believe that to be low compared with other attorneys who are similarly experienced and devoted to the media defense area of practice.  Many of them apply a billing rate of $650 - $750/hour.

12.     We request that the Court apply my current rate of $550/hour – if not the market rate of $650 or more that I understand that is reasonably charged by attorneys with a similar level of experience who defend the press on such matters.

13.     I believe the fees my firm has billed ATL are reasonable – indeed, well below prevailing market rates for the specialized legal services we supplied – especially given my firm's particular focus on media defense and First Amendment law, and its experience in litigation and trial/appellate advocacy in this District and in the Second and Ninth Circuits.

14.     My partner Jeffrey Craig Miller and I founded the firm in 1986.  Over the last 35 years I have defended book, magazine, and online publishers, broadcasters, news organizations and human rights organizations from claims directed at the content of their publications such as libel, privacy, copyright, trademark and news gathering torts.

15.     Prior to being admitted to practice law in the State of New York, I received an AB Degree from Harvard University in 1972, an MA from Columbia University in Philosophy in 1976, and a Juris Doctorate in 1979 from the Benjamin N. Cardozo School of Law, where I served as Articles Editor for the *Law Review*.

16.     I also served as an Adjunct Professor at the Benjamin N. Cardozo School of Law for 23 years, teaching media, entertainment law, and advanced copyright.  I previously taught as an adjunct faculty member at the Columbia University School of Business.  I am an active member of the Media Law Resource Center and have previously chaired the International Media Law Committee of the Magazine Publishers of America.  I have authored works including the following:

> *The Underlying Philosophical Differences between U.S., U.K. and ECHR Law on Freedom of Expression: Why Are the British Not More British?,* published in *"*MLRC London Conference Papers," Media Law Resource Center, London, 2019.
>
> *Press Freedom in the Balance: A Comparative Explanation and Critique of ECHR's Developing Case Law on Privacy and Libel*, published in "Publishing in the Global Environment – Developments in European and American Media Law," Media Law Resource Center, London Conference, 2007.
>
> *An American Lawyer's Comparative Introduction to the Developing Law of the European Court of Human Rights in Libel Cases*, published in "International Media Liability." Media Law Resource Center, 2003.
>
> *Libel and Privacy Suits against U.S. Media in Foreign Courts*, published in "Print and Electronics Publishing: Legal and Business Issues," Practicing Law Institute, 1997 and 1998.

*Moral Rights of Authors and Artists under U.S. and International Copyright Law*, published in "Entertainment Industry Contracts" treatise, Matthew Bender & Co., 1996. I have organized and spoken at many seminars and academic programs on First Amendment, Reporter's Privilege, copyright and other areas of media law, among them a 2013 Practicing Law Institute program on copyright and fair use.

17.     In defending ATL against Respondent's Subpoena, my firm has been able to draw upon its up to date and active knowledge of statutory and case law, treatises, and other authorities relating to the Reporter's Privilege; its filings and experience from previous matters for other clients, and its filings and experience from previous litigation matters in this District – all of which represented savings to our client.  Among the Reporter's Privilege matters I have litigated are *Schoolcraft v. City of New York*, No. 10-cv-6005 (RWS), 2014 WL 1621480 (S.D.N.Y. Apr. 22, 2014) (representing journalist Graham Rayman), and *Green v. Cosby*, No. 16-mc-99 (PGG), Dkt. No. 13 (S.D.N.Y. May 11, 2016) (representing *New York* Magazine).  I have also defended the BBC, *Fortune*, Consumer Reports and The Village Voice (Wayne Barrett), among others, against third-party Subpoenas.

18.     My firm focuses almost exclusively on media defense, First Amendment and copyright.  As our time summaries in Exhibit A indicate, I have endeavored to delegate tasks in this matter to my firm's recent partner, Terence P. Keegan, who has advised clients on media and intellectual property litigation matters at our firm since joining as an associate in February 2014. Zachary M. Press, who also focuses on media and intellectual property litigation, joined the firm in August 2018 as an associate.  Together with me, their recent Reporter's Privilege work includes defending *Fortune* and former *Fortune* Editor-at-Large Roger Parloff against a subpoena from former Theranos president Ramesh "Sunny" Balwani.  *See Balwani v. Parloff, et al.*, No. 19-mc-00507 (ALC), Dkt. No. 16 (S.D.N.Y. Dec. 6, 2019) (pending).

19.     The time summaries in Exhibit A show how the Motions to Quash occupied a significant amount of our attorneys' days; and pressed my firm off other matters and clients.  The defense of ATL was taxing for us in the time that it demanded, but it engaged issues with which we had much familiarity and experience.

20.     The total fees and expenses sought for our work and time is ***$38,293.67***, which includes my work at $550/hour for 39.50 hours; Terence Keegan's work at $425/hour for 20.10 hours; and Zachary Press' work at $400/hour for 19.80 hours.  There were $106.17 in expenses ($49.00 for the Miscellaneous Part filing fee; and $57.17 for outside printing for courtesy copies).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, NY
           April 28, 2021                           /s/ David S. Korzenik
                                                            **David S. Korzenik**